ASSOCIATED BUILDERS & CONTRACTORS OF RHODE ISLAND, INC., Robert F. Audet, Inc., Delta Mechanical of New England, Inc., Regan Engineering & Service, Inc., Ralph Adamo, James Rezendes, and Michael Babbitt, Plaintiffs,

v.

CITY OF PROVIDENCE, Defendant,

Union Station Plaza Associates, L.P., Intervenor,

Rhode Island Building and Construction Trades Council, Intervenor.

No. C.A.98–598–L.

United States District Court, D. Rhode Island.

Aug. 16, 2000.

William E. O'Gara, McGovern, Noel & Benik, Providence, RI, Robert E. Flaherty, Warwick, RI, for Plaintiffs.

Kevin P. McHugh, City of Providence Law Dept., Providence, RI, for City of Providence.

Girard R. Visconti, Visconti & Boren, Providence, RI, for Intervenor-Defendant Union Station Plaza Associates.

Marc Gursky, Providence, RI, for Intervenor-Defendant R.I. Building and Construction Trades Council.

### DECISION AND ORDER

LAGUEUX, District Judge.

This case is before the Court on cross-motions for summary judgment filed by plaintiffs, defendant City of Providence ("the City") and intervenor Rhode Island Building and Construction Trade Council ("intervenor RIBCTC"). In addition, the City and intervenor RIBCTC have each filed a motion, in the alternative, to dismiss because plaintiffs lack standing to bring the suit and on mootness grounds. Because this Court concludes that plaintiffs have brought a justiciable action under Article III of the Constitution and that the City's action is preempted by the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1994), ("NLRA"), plaintiffs' motion for summary judgment is granted and the motions of the City and intervenor RIBCTC are denied.

## I. Background

Plaintiff Associated Builders and Contractors of Rhode Island is a trade organization that represents approximately ninety contractors that employ more than two thousand Rhode Island residents. Plaintiffs Robert F. Audet, Inc., Delta Mechanical of New England, Inc., and Regan Engineering & Service, Inc. are contractors with their principal place of business in Rhode Island. Plaintiffs Ralph Adamo, James Rezendes, and Michael Babbitt are construction workers employed by the plaintiff contractors. The contractor plaintiffs do not have contractual relationships with any labor organizations and operate as "open-shop" contractors that employ their own workers. The employee plaintiffs do not wish to join or be represented by a labor organization.[1]

Intervenor Union Station Plaza Associates, L.P. ("intervenor Union Station"), a Rhode Island limited partnership, is a developer that is currently constructing a $15,650,000 hotel in downtown Providence ("the Union Station Project"), which is expected to be completed in July, 2000. It is unclear from the record exactly when construction on the Union Station Project began.

On November 23, 1998, the Providence City Council enacted Ordinance 1998–54 ("the tax treaty"), which establishes a tax stabilization plan for the Union Station Project, pursuant to R.I. Gen. Laws § 44–3–9. That section provides that the City Council "may vote to ... exempt from payment, in whole or in part, real and personal property used for manufacturing, commercial, or residential purposes, or to determine a stabilized amount of taxes to be paid on account of the property, notwithstanding the valuation of the property or the rate of tax[,]" provided that the City Council determines that the exemption or stabilization "will inure to the benefit of the town" by one of several stated reasons. R.I. Gen. Laws § 44–3–9(a)(1)(1999).

Pursuant to the tax treaty, the property taxes owed by intervenor Union Station are stabilized over a period of 12 years. In exchange, intervenor Union Station agrees to certain conditions. The condition at issue, contained in § 5 of the tax treaty, requires intervenor Union Station to execute and abide by a Project Labor Agreement ("PLA") with intervenor RIBCTC, an affiliation of local unions. The PLA required by § 5 of the tax treaty, like other PLAs typically used in the construction industry, establishes intervenor RIBCTC as the collective bargaining representative for all workers on the project and provides that only contractors and subcontractors who sign a pre-negotiated agreement with intervenor RIBCTC can perform work on the project. The PLA also prohibits intervenor RIBCTC or any of its affiliates from striking, picketing or boycotting throughout the life of the Project.

On December 16, 1998, plaintiffs filed a Verified Complaint and Request for Injunctive Relief. The Complaint alleges that the City intends to establish similar tax treaties, in which tax stabilization is conditioned upon an agreement by the developer to execute and enforce a PLA with intervenor RIBCTC, on several proposed construction projects in the City of Providence with total contract costs that exceed $100 million. The Complaint, in addition to alleging state law violations, alleges that such a policy is preempted by the NLRA. Plaintiffs seek injunctive and/or declaratory relief prohibiting the City from including a PLA requirement in future tax treaties. Plaintiffs also seek damages and attorneys' fees under 42 U.S.C. §§ 1983 and 1988.

Upon filing the Complaint, plaintiffs moved for a temporary restraining order ("TRO") enjoining the City from conditioning tax stabilization on execution and enforcement of a PLA on any private construction project, including the Union Sta-

---

1. All plaintiffs will be collectively referred to as "plaintiffs."

tion Project. On December 22, 1998, that motion was denied.

This writer permitted intervenors Union Station and RIBCTC to intervene in the litigation on March 16, 1999 and April 13, 1999, respectively.

On June 11, 1999 plaintiffs filed a motion for summary judgment, alleging that the City's actions were preempted by the NLRA as a matter of law. On July 26, 1999, the City objected to plaintiffs' motion and filed a cross-motion for summary judgment, alleging that its actions were not, as a matter of law, preempted by the NLRA, and filed, in the alternative, a motion to dismiss, alleging that plaintiffs lack standing to bring suit and that the action is moot. Putting forth these same arguments, intervenors Union Station and RIBCTC subsequently joined in the City's objection to plaintiffs' summary judgment motion and RIBCTC filed its own cross-motions for summary judgment and, in the alternative, dismissal. On November 11, 1999, this Court heard oral arguments and took the matter under advisement. The case is now ready for disposition.

The Court will first address the City's and intervenor RIBCTC's motions to dismiss for lack of standing and mootness, as these are threshold issues. The Court will then address the cross-motions for summary judgment on the merits.

## II. Motion to Dismiss

### A. Legal Standard

In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to plaintiff, taking all well-pleaded allegations as true and giving plaintiff the benefit of all reasonable inferences. *See Figueroa v. Rivera,* 147 F.3d 77, 80 (1st Cir.1998). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Discussion

The City and intervenor RIBCTC argue first that plaintiffs lack standing to bring suit. "The doctrine of standing is 'an essential and unchanging part of the case-or-controversy requirement of Article III' " of the Constitution. *Northeastern Fla. Chapter of The Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)(citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

A party seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing:

(1) 'injury in fact,' by which [is meant] an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,'... (2) a causal relationship between the injury and the challenged conduct, by which [is meant] that the injury 'fairly can be traced to the challenged action of the defendant,' and has not resulted 'from the independent action of some third party not before the court,'... and (3) a likelihood that the injury will be redressed by a favorable decision, by which [is meant] that the 'prospect of obtaining relief from the injury as a result of a favorable ruling' is not 'too speculative[.]'

*Id.* at 663–664, 113 S.Ct. 2297 (citations omitted). These elements are the " 'irreducible minimum'... required by the Constitution." *Id.* at 664, 113 S.Ct. 2297 (citation omitted).

The City and intervenor RIBCTC argue that because the plaintiff contractors did not bid on the Union Station Project and have not bid on any pending projects allegedly affected by the City's policy of requiring developers to implement PLAs, and because the plaintiff employees did not work and have not attempted to work on those projects, plaintiffs cannot establish

an injury in fact suffered as a result of the tax treaty, such as the loss of work or a contract. Furthermore, the City and intervenor RIBCTC argue, plaintiffs were not and are not even prevented by the City's policy from bidding or working on the Union Station Project and other projects.

It is undisputed that the plaintiff contractors did not bid on the Union Station Project and have not bid on any pending projects affected by the City's policy and that the plaintiff employees did not work and have not attempted to work on those projects. It is also undisputed that the policy does not technically prevent plaintiffs from bidding or working on affected projects—non-union contractors and employees can work on the projects as long as they agree to abide by the terms of the PLA for the length of the project. However, plaintiffs rely on the Supreme Court's decision in *City of Jacksonville* to argue that they need only show that they wish to bid or work on the projects in issue but are deterred from doing so because of the City's policy. *See id.* at 666, 113 S.Ct. 2297. In that case, an association of general contractors brought suit under the Equal Protection Clause of the Fourteenth Amendment, challenging a city ordinance according preferential treatment to certain minority-owned businesses in the award of city contracts. *See id.* at 658–659, 113 S.Ct. 2297. The Supreme Court held that those plaintiffs had established an injury in fact even though they had not bid on the contracts in issue: "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* at 666, 113

S.Ct. 2297 (citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)). Plaintiffs in such cases "need only demonstrate that [they are] able and ready to bid on contracts and that a discriminatory policy prevents [them] from doing so on an equal basis." *Id.*

 This Court agrees with plaintiffs that *City of Jacksonville* applies to the case at bar. Even though plaintiffs' claim here is brought under the Supremacy Clause, instead of the Equal Protection Clause, the Supreme Court's reasoning applies with equal force. When contractors and employees are deterred from bidding or working on projects because of state or local encroachment of their federal rights, they sustain an injury. At least one Court of Appeals has so held. *See Associated Gen. Contractors of Am. v. Metropolitan Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir.1998)(relying on *City of Jacksonville* to conclude that plaintiff contractors, challenging under the Supremacy Clause a public agency's policy of requiring PLAs on its large construction projects, established an injury in fact merely by alleging that they were able and ready to bid on the projects and that the PLA requirement deterred them from doing so). *See also Associated Builders & Contractors, Golden Gate Chapter Inc. v. Baca*, 769 F.Supp. 1537, 1542 (N.D.Cal.1991)(concluding, pre-*City of Jacksonville*, that reduced competition in the construction industry constitutes injury in fact to contractors challenging a city ordinance under the Supremacy Clause), *aff'd sub nom. Chamber of Commerce of U.S. v. Bragdon*, 64 F.3d 497 (9th Cir.1995).[2] Therefore, by alleging

---

2. Also significant to this issue is the Supreme Court's decision in *Building and Constr. Trades Council v. Associated Builders and Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993)("*Boston Harbor*"), decided during the same term as *City of Jacksonville*. In that case, the plaintiff contractors challenged a state agency's bid specification, on a $6.1 billion, 10–year state construction project, requiring con-

tractors to agree to abide by a PLA. *See id.* at 221–223, 113 S.Ct. 1190. The plaintiffs were able and ready to bid for work on the project, but declined to do so because of the PLA requirement. *See Associated Builders and Contractors of Mass./R.I. v. Massachusetts Water Resources Auth.*, 1990 WL 86360, *1 (D.Mass. Apr.11, 1990), *rev'd*, 935 F.2d 345 (1st Cir.1991), *rev'd sub nom. Boston Harbor*, 507 U.S. at 233, 113 S.Ct. 1190. The issue

that they were and are willing to bid or work on the Union Station Project and other projects and that they are deterred from doing so as a result of the City's policy, plaintiffs have identified a "concrete" injury in a manner that is "particularized."

However, in addition to identifying a "'concrete and particularized'" injury, a plaintiff must also establish that the injury is "'actual or imminent, not conjectural or hypothetical.'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)(quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). In *Adarand*, the plaintiff was a subcontractor who had undisputedly lost the guardrail portion of a federal contract because of a "subcontractor compensation clause," which awarded compensation to the general contractor of the project if it hired "disadvantaged" subcontractors, as that term was defined by the Small Business Administration ("SBA"). *Id.* at 209, 115 S.Ct. 2097. The plaintiff sought damages for the lost contract and declaratory and injunctive relief against the future use of subcontractor compensation clauses. *See id.* at 210, 115 S.Ct. 2097. While the Court acknowledged that the loss of the contract entitled the plaintiff to seek damages, it noted that "[i]t is less clear ... that the future use of subcontractor compensation clauses will cause [the plaintiff] 'imminent' injury." *Id.* at 210–211, 115 S.Ct. 2097. The Court noted that the fact of past

before the Supreme Court was whether the bid specification was preempted by the NLRA. *See Boston Harbor*, 507 U.S. at 223, 113 S.Ct. 1190. At no time was the issue of the plaintiffs' standing raised by the defendant or by the various courts hearing the case, including the Supreme Court. Since federal courts have an obligation to address Article III justiciability issues like standing even if they are not raised by the parties, *see Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), this suggests that the plaintiffs' alleged injury constituted an injury in fact for standing purposes. It follows, therefore, that the plaintiffs in this case, who allege the same injury, have satisfied the requirement.

injury "'does nothing to establish a real and immediate threat that [a plaintiff] would again' suffer similar injury in the future." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Thus, the Court framed the standing issue as "whether [the plaintiff] has made an adequate showing that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors[,]" such that it was entitled to seek forward-looking relief. *Id.* at 211, 115 S.Ct. 2097.

A similar situation exists in this case. While it is true that plaintiffs have pointed to an actual injury insofar as they were deterred from bidding or working on the Union Station Project, that injury does not necessarily establish their standing to seek forward-looking relief.[3] Therefore, the question is whether it is "imminent" that plaintiffs will wish to bid or work on another private project on which the developer secures favorable tax treatment from the City in exchange for an agreement to execute and abide by a PLA.

In *Adarand*, the Supreme Court found the following evidence sufficient to conclude that the plaintiff had established an imminent injury: 1) deposition testimony of the plaintiff's general manager stating that the plaintiff bids on every guardrail project in Colorado; 2) statistical evidence

3. Although plaintiffs' complaint seeks damages in addition to forward-looking relief, the actual injury about which they complain, inability to compete for the Union Station Project without sacrificing their federal rights under the NLRA, is not an economic injury entitling them to damages, like loss of a contract as alleged in *Adarand*. Although plaintiffs may be entitled to equitable relief to remedy that particular injury, plaintiffs do not seek such relief, specifically stating in their complaint and in their motion for summary judgment that they do not wish to impact the Union Station Project. Thus, plaintiffs apparently are only using the Union Station Project injury as an example of why they are entitled to the forward-looking relief they seek.

that the federal agency at issue let on average one and a half contracts requiring guardrail work and containing subcontractor compensation clauses per year; and 3) evidence indicating that the plaintiff often competed for contracts against "disadvantaged" businesses that qualified under the compensation clause. *See id.* at 212, 115 S.Ct. 2097.

■ In this case, plaintiffs allege in their complaint that collectively they have completed "hundreds" of construction projects and that they wish to bid and work on future construction projects in the City of Providence, but will not do so when adherence to a PLA is required. In addition, deposition testimony of a city official indicates that it is the policy of the City, "under certain circumstances," to require private developers receiving favorable tax treatment to execute and enforce a PLA. Plaintiffs point to Ordinance No. 319, enacted June 10, 1999, which establishes tax stabilization for another large private construction project in the City of Providence and requires execution of a PLA like the one required on the Union Station Project, as an example of the City's intention to implement its policy. Importantly, the City does not deny that it has such a policy of requiring execution of a PLA in exchange for tax stabilization, defending its actions instead on the other grounds discussed in this opinion. Although plaintiffs have not statistically identified the extent to which they will be affected by the City's policy, as in *Adarand,* this Court concludes that the evidence sufficiently establishes that plaintiffs will be deterred in the future from bidding and working on large private construction projects in the City of Providence because of the City's policy of requiring developers to execute and en-

force a PLA in exchange for favorable tax treatment. Consequently, plaintiffs have identified an "imminent" injury in fact.

The other two standing requirements, that the injury is "fairly traceable" to the defendant and that the injury will likely be redressed by a favorable decision, *see City of Jacksonville,* 508 U.S. at 663–664, 113 S.Ct. 2297 (citations omitted), are also met in this case. The action of the City, in requiring execution and enforcement of a PLA in exchange for favorable tax treatment, creates an incentive for private developers to require contractor and employee compliance with a PLA. As discussed above, the injury to plaintiffs is the inability to compete in the construction industry without that governmental incentive. Framed in this manner, the traceability and redressability of plaintiffs' injury is clear. *See id.* at 666 n. 5, 113 S.Ct. 2297. *See also Adarand,* 515 U.S. at 212, 115 S.Ct. 2097 (traceability and redressability not even addressed after imminence of similar injury established).

Therefore, plaintiffs have standing to bring this action.[4]

■ The City and intervenor RIBCTC also argue that the case is moot because plaintiffs claim that they do not wish to affect the Union Station Project, and because the Union Station Project is almost complete. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)(a case becomes moot when " 'the parties lack a legally cognizable interest in the outcome' ")(quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). However, as discussed above, plaintiffs do not seek relief specifically from their injury associated with the Union Station Project, but instead

---

4. The City does not challenge the plaintiff trade organization's standing to bring this action on behalf of its members and this Court agrees that such standing exists. An organization has standing under Article III of the Constitution if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n.,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). All three requirements are met in this case.

seek forward-looking relief to prevent the City from implementing its policy on future projects. Consequently, since plaintiffs have a cognizable interest in securing forward-looking relief, the case is not moot.

## III. Preemption

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). When deciding cross-motions for summary judgment, the Court must consider each motion separately, drawing inferences against each movant in turn. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. *See id.*

### B. Discussion

There is no statutory preemption provision contained within the NLRA. *See generally* 29 U.S.C. § 151 *et seq.* (1994). Although the absence of such a provision creates a " 'basic assumption that Congress did not intend to displace state law[,]' " *Boston Harbor*, 507 U.S. at 224,

113 S.Ct. 1190 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)), state or local regulation will be preempted where " 'it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' " *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (citations omitted).

In accordance with these principles, the Supreme Court has articulated two preemption doctrines under the NLRA. *See id.* at 748, 105 S.Ct. 2380. The first, "*Garmon* preemption," prohibits state or local regulation of activities that are protected by § 7 of the NLRA or that constitute unfair labor practices under § 8 of the NLRA. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption prohibits regulation even of activities that the NLRA only arguably protects or prohibits. *See Boston Harbor*, 507 U.S. at 225, 113 S.Ct. 1190. "This rule of preemption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation'... embodied in §§ 7 and 8 of the NLRA[.]" *Id.* (citations omitted). *See also Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986)("*Golden State I* ").

The second NLRA preemption doctrine, "*Machinists* preemption," prohibits state and local regulation of areas that have been "left 'to be controlled by the free play of economic forces.' " *Lodge 76, Intern. Ass'n. of Machinists, AFL–CIO v. Wisconsin*, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)(quoting *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)). *Machinists* preemption "protects against state interference with policies implicated by the structure of the [NLRA] itself, by preempting state law ... concerning conduct

that Congress intended to be unregulated." *Metropolitan Life Ins. Co.*, 471 U.S. at 749, 105 S.Ct. 2380. *See also Golden State I*, 475 U.S. at 614, 106 S.Ct. 1395.

Plaintiffs contend that the City, by conditioning tax stabilization on a private developer's commitment to execute and enforce a PLA and thereby requiring all contractor employers and employees to abide by that PLA, has injected itself into the collective bargaining process in a manner that runs afoul of both preemption doctrines. Plaintiffs, however, rely primarily on *Golden State I*, 475 U.S. at 619, 106 S.Ct. 1395, in which *Machinists* preemption was applied, to support their argument. Since this Court concludes that the City's actions are preempted under the *Machinists* doctrine, it will not reach the issue of *Garmon* preemption.

In *Golden State I*, the City of Los Angeles refused to renew the plaintiff's taxicab franchise unless the plaintiff resolved a labor dispute with its striking employees. The Supreme Court held that the city's action was preempted under *Machinists* because it "imposed a positive durational limit" on the plaintiff's ability to use "its economic power to withstand the strike in an attempt to obtain bargaining concessions from the union." *Id.* at 615, 106 S.Ct. 1395. Such an action, the Court held, constituted an impermissible intrusion into the collective bargaining process. *See id.* at 619, 106 S.Ct. 1395. The Court rejected the city's argument that it was somehow insulated from preemption because it had acted through its franchise procedures rather than a general law: "'[J]udicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.'" *Id.* at 614 n. 5, 106 S.Ct. 1395 (citing *Garmon*, 359 U.S. at 243, 79 S.Ct. 773). Similarly, the Court rejected the city's argument that it was "not regulating labor, but simply exercising a traditional municipal function in issuing taxicab franchises." *Id.* at 618, 106 S.Ct. 1395.

In this case, the City's action certainly intrudes into the bargaining process at least as much as the conduct struck down in *Golden State I*. In exchange for favorable tax treatment, the City requires that a PLA be implemented on a private construction project, dictates with whom it is to be entered and specifies at least some terms of the PLA. As the Supreme Court noted in *Golden State I*, "'[f]ree collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA.'" *Id.* at 619, 106 S.Ct. 1395 (quoting *New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, 551, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979)(Powell, J., dissenting)). By influencing the decisions of private employers and employees regarding whether or not, and with whom, to bargain, the City clearly implicates conduct Congress meant to leave unregulated.

Indeed, the City and intervenors do not dispute that a local law or regulation requiring private developers to execute and enforce PLAs would be preempted by the NLRA under *Golden State I*. The City and intervenors attempt to escape application of *Golden State I*, however, by arguing that the City's action, unlike the city's action in that case, is "proprietary" rather than regulatory in nature. Consequently, the City and intervenors urge this Court to apply the "market participant" exception to NLRA preemption utilized by the Supreme Court in *Boston Harbor*, 507 U.S. at 233, 113 S.Ct. 1190. In that case, the Massachusetts Water Resources Authority ("MWRA"), a state agency responsible for cleaning up the Boston Harbor, issued a bid specification for the project, requiring successful bidders to abide by the terms of a PLA. *See id.* at 222, 113 S.Ct. 1190. In considering whether this action was preempted by the NLRA, the Court explained:

> When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone

protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.

*Id.* at 226–227, 113 S.Ct. 1190 (emphasis theirs). The Court went on to explain that the concerns prompting preemption of state regulation, namely the power of the state as a regulator and its "characteristically ... governmental" role, "are far less significant when the State acts as a market participant with no interest in setting policy." *Id.* at 229, 113 S.Ct. 1190. The Court thus held that because the MWRA was acting as a purchaser of construction services in furtherance of its interest of assuring an efficient project at the lowest possible cost, its action was not "regulation" subject to NLRA preemption. *See id.* at 232–233, 113 S.Ct. 1190.

The City and intervenors argue that by granting private developers tax stabilization, the City is essentially making a monetary contribution to these projects and is thus akin to a "co-developer" of the projects. As such, the City and intervenors argue, the City has a proprietary interest in assuring that the projects are completed efficiently and at a low cost. The City and intervenors argue that because the City's motive in requiring execution of a PLA in return for its "contribution" is simply to further this proprietary interest and to benefit the City, and not to set labor policy, the *Boston Harbor* exception should apply to save the PLA requirement from preemption.

▪ The Supreme Court has rejected the argument that a grant of favorable tax treatment constitutes market participation in its dormant Commerce Clause jurisprudence, which includes a similar exception

to the one applied in *Boston Harbor*. *See Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 592–593, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). Specifically, although the dormant Commerce Clause prevents state interference with interstate commerce, a state is free from such restriction when it acts in its proprietary capacity as a purchaser or seller of goods or services. *See White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 208, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). In *Camps Newfound*, 520 U.S. at 592–593, 117 S.Ct. 1590, the Supreme Court was faced with the question of whether to apply this exception to a state tax exemption for charitable institutions which favored institutions that served mostly state residents. The defendant in that case argued that the tax scheme was a governmental "purchase" of charitable services, such that the market participant exception applied. *See id.* at 589, 117 S.Ct. 1590. While acknowledging that the grant of tax benefits has " 'the purpose and effect of subsidizing a particular industry,' " *id.* at 593, 117 S.Ct. 1590 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 277, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)), the Court concluded that "[a] tax exemption is not the sort of direct state involvement in the market that falls within the market-participation doctrine." *Id.* The Court reasoned that the governmental action " 'ultimately at issue' " was not the purchase or sale of goods or services, but the " 'assessment and computation of taxes—a primeval governmental activity.' " *Id.* (quoting *New Energy*, 486 U.S. at 277, 108 S.Ct. 1803).

▪ At least one district court has reached the same conclusion in applying the *Boston Harbor* exception to a grant of favorable tax treatment in the context of NLRA preemption, *see Hudson County Bldg. & Constr. Trades Council v. City of*

*Jersey City,* 960 F.Supp. 823, 833 (D.N.J. 1996)(city was engaged in regulatory, not proprietary, activity, such that market participation doctrine did not apply to preclude NLRA preemption, in enacting an ordinance requiring business receiving "economic incentives," including tax abatements and exemptions, to make good faith effort to hire 51% city residents), and the City and intervenors cite no case reaching the opposite conclusion. This Court agrees that a grant of favorable tax treatment is not sufficient participation in the marketplace to shield the action from federal preemption. The City in this case is not "purchasing" construction services or otherwise exhibiting behavior analogous to that of private parties in the marketplace. It is carrying out its "primeval governmental activity" of assessing taxes and thus may not perform that activity in a manner that conflicts with federal law.

Since the City is not acting as a market participant, its alleged labor-neutral motive cannot be used to invoke the exception or otherwise shield the City's action from preemption. Motive is only examined in preemption cases to determine whether, when a governmental entity *is* acting as a purchaser or seller of goods or services in the marketplace, its actions may nonetheless be subject to federal preemption because of their regulatory effect. For example, in *Wisconsin Dep't. Of Industry, Labor and Human Relations v. Gould,* 475 U.S. 282, 289, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the Supreme Court struck down as preempted a state law debarring repeat violators of the NLRA from doing business with the state. The Court rejected the state's argument that its purchasing decisions were shielded from preemption, because the state conceded that the purpose of the law was to "deter labor law violations." *Id.* at 287, 106 S.Ct. 1057. Such a purpose, the Court concluded, rendered the spending decision "tantamount to regulation." *Id.* at 289, 106 S.Ct. 1057. Similarly, in *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1337 (D.C.Cir.1996), the D.C. Circuit struck down as preempted

an Executive Order barring the federal government from contracting with employers who hire permanent strike replacement workers during a strike, because the Order "[sought] to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers." Finally, in *Van–Go Transp. Co., Inc. v. New York City Bd. of Educ.,* 53 F.Supp.2d 278, 289 (E.D.N.Y. 1999), the Eastern District of New York declined to apply the market participation exception to the New York City Board of Education's refusal to certify a replacement workforce for a city contractor's striking workers. Although the city had a proprietary interest in the contract, the Court found "powerful evidence" that the city was acting with a regulatory motive, thereby rendering the market participant exception inapplicable. *See id.*

There is no authority to suggest that a labor-neutral motive can save from preemption governmental action that does not constitute participation in the marketplace. Indeed, *Golden State I* supports the opposite conclusion. There, the Supreme Court found the city's action of conditioning a franchise renewal on resolution of a labor dispute preempted without disturbing the Appeals Court's finding that there was "nothing in the record to suggest that the city's nonrenewal decision 'was not concerned with transportation.'" *Golden State I,* 475 U.S. at 612, 106 S.Ct. 1395 (quoting 754 F.2d 830, 833 (1985)). Therefore, this Court will not adopt the novel position that the City's alleged labor policy-neutral motive can somehow transform its action into a form of market participation worthy of *Boston Harbor* protection.

Even if the grant of favorable tax treatment may in some circumstances be considered participation in the marketplace or if a labor-neutral motive may save some non-proprietary governmental action from preemption, this case is not a good candidate for the application of those proposi-

tions. The City's action in this case is not limited to one particular project, but is rather a policy to be implemented on several projects. This distinction has been important to courts refusing to apply the market participant exception, because a policy, regardless of the motive behind it, is more "regulatory" than "proprietary" in nature than a single contracting or, in this case, taxing decision. *See Reich,* 74 F.3d at 1337; *Van–Go,* 53 F.Supp.2d at 288. Furthermore, although the City claims that its motive is entirely labor policy-neutral, the tax treaty, and presumably those that will follow it, has a policy-oriented tone. In addition to requiring execution of a PLA, the tax treaty also sets forth requirements regarding minority business and city resident involvement on the Project. Such requirements, though not challenged and not considered in this case, indicate that the City is attempting to set policy through its grant of favorable tax treatment.

Therefore, this Court concludes that because the City's policy of requiring execution of PLAs on private construction projects receiving favorable tax treatment is a regulatory action that impermissibly intrudes into the collective bargaining process, it is preempted by the NLRA.

IV. Conclusion

For the preceding reasons, plaintiffs' motion for summary judgment is granted. The City's and intervenors' motions are denied. Plaintiffs are entitled to a declaration that the City's policy requiring execution of a PLA in exchange for favorable tax treatment is preempted by the NLRA and thus is violative of the Supremacy Clause of the United States Constitution. Because this Court finds the City's action preempted under federal law and grants the requested declaratory relief, this Court need not address plaintiffs' state law claims as alleged in the Complaint. As discussed above, plaintiffs are not entitled to any damages as sought in the Com-

plaint, because they have not alleged any economic injury.

 However, Plaintiffs are entitled to costs and an award of counsel fees under 42 U.S.C. § 1988. Any motion for such costs including counsel fees shall be made within thirty (30) days of this decision. The application for counsel fees must be supported by a detailed, contemporaneous accounting of the time spent by the attorneys on this case. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). To avoid piecemeal appeals, no judgment shall enter until the issue of costs and counsel fees is resolved.

It is so ordered.