OHIO STATE BUILDING & CONSTRUCTION TRADES COUNCIL ET AL.,

APPELLANTS, *v.* CUYAHOGA COUNTY BOARD OF COMMISSIONERS ET AL.,

APPELLEES.

[Cite as *Ohio State Bldg. & Constr. Trades Council v. Cuyahoga Cty. Bd. of Commrs.*, 98 Ohio St.3d 214, 2002-Ohio-7213.]

*Labor and industry — Public construction projects — Sections 8(e) and (f) of the National Labor Relations Act preempt R.C. Chapter 4116 — Enforcement of R.C. Chapter 4116 enjoined.*

(No. 2001-2036 — Submitted September 25, 2002 — Decided December 27, 2002.)

APPEAL from the Court of Appeals for Cuyahoga County, Nos. 77242 and 77262, 2001-Ohio-4228.

_____

SYLLABUS OF THE COURT

Sections 8(e) and (f) of the National Labor Relations Act, as enacted by the 1959 Landrum-Griffin Act, Sections 158(e) and (f), Title 29, U.S.Code, preempt R.C. Chapter 4116, as enacted by Am.H.B. No. 101 of the 123rd General Assembly, which flatly prohibits public authorities from entering into or enforcing project labor agreements on public construction projects.

_____

**ALICE ROBIE RESNICK, J.**

{¶1} This action for declaratory and injunctive relief challenges the constitutionality of R.C. Chapter 4116, which was enacted by Am.H.B. No. 101 of the 123rd General Assembly, effective October 11, 1999, "to prohibit public

authorities from imposing certain labor requirements as a condition of performing public works." Preamble to 1999 Am.H.B. No. 101.

{¶2} The following facts, though gleaned from scant evidence, are sufficient for purposes of the present inquiry. Between September 1998 and July 1999, defendant-appellee Cuyahoga County Board of Commissioners ("board") held several meetings with Loree Kenneth Soggs, executive secretary to plaintiff-appellant Cleveland Building & Construction Trades Council ("CBCTC"), to discuss the propriety of establishing a project labor agreement ("PLA") to govern construction of the county's proposed new juvenile detention center.

{¶3} As proposed by Soggs, the PLA for the detention center would be typical of PLAs that CBCTC had negotiated on other construction projects, which generally contain union security clauses, provisions establishing standard work rules and prohibiting strikes, lockouts, slowdowns, and other work stoppages during the course of construction, a provision regarding the use of CBCTC's hiring halls to supply the project's labor force, and possibly a requirement that the various contractors on site become signatory to individual collective bargaining agreements with the affiliated local unions of the CBCTC. The board would then impose a requirement, presumably through its bid specifications and subsequent agreements with individual contractors, that "successful bidders agree to enter into a project labor agreement * * * [and] that contractors and/or subcontractors on the Project agree to abide by [its terms]."

{¶4} In his testimony at the preliminary injunction hearing, Soggs indicated that the board was "very receptive" to the idea of developing such an agreement for the detention center project and stated that "the commissioners individually * * * told me they were in favor of the project labor agreement." As the board was considering the issue, however, Am.H.B. No. 101 was winding its way through the legislative process. The bill was passed by the Ohio House of

Representatives on May 12, 1999, and by the Ohio Senate on June 23, 1999. When Governor Bob Taft's intention neither to sign nor veto the bill was announced in a release dated June 30, 1999, it was clear that Am.H.B. No. 101 would become law without his signature pursuant to Section 16, Article II of the Ohio Constitution.

{¶5} Accordingly, in a letter dated July 2, 1999, the county's deputy administrator, Lee A. Trotter, informed Soggs as follows:

{¶6} "As you know the County had been working toward developing a Project Labor Agreement for its proposed new Juvenile Detention Center since 1998. We have had several meetings and exchanged information geared toward identifying the key benefits of such an agreement for both the County and The Cleveland Building and Construction Trades Council.

{¶7} "We have recently been informed of the passage of H.B. 101, prohibiting a public authority from requiring that a bidder, contractor, or subcontractor become a party to a project labor agreement as a condition of being awarded a public improvement project. The passage of H.B. 101 prohibits the County from pursuing the development and execution of the proposed agreement. Should conditions change allowing Project Labor Agreements we will immediately revisit this issue."

{¶8} On September 9, 1999, CBCTC, along with plaintiffs-appellants Ohio State Building & Construction Trades Council and International Union of Operating Engineers, Local 18, commenced the present action by filing a verified complaint in the Cuyahoga County Court of Common Pleas against the board and defendant-appellee state of Ohio. The complaint essentially charges that Am.H.B. No. 101, as codified at R.C. Chapter 4116, is preempted by the National Labor Relations Act ("NLRA"), Section 151 et seq., Title 29, U.S.Code, and, therefore, violates the Supremacy Clause of the United States Constitution.

**{¶9}** Finding that the NLRA leaves the responsibility for "the negotiation and administration of * * * prehire collective bargaining agreements [to] labor organizations" and that "[t]hat responsibility * * * is precluded by Amended House Bill 101," the trial court declared R.C. Chapter 4116 invalid under the Supremacy Clause and permanently enjoined its enforcement.

**{¶10}** In a split decision, the court of appeals reversed the judgment of the trial court. In so doing, the court of appeals found that R.C. 4116.02 "does not on its face or by its application prohibit a public authority from entering into a PLA." Instead, the statute prohibits a public authority only "from entering into a PLA with objectionable terms," as set forth in R.C. 4116.02(A) and (B). According to the appellate court, "a PLA can be drafted without these terms and still be valid and enforceable." Thus, the court concluded, "there is no real controversy that warrants declaratory relief."

**{¶11}** The court of appeals also considered whether the statute would be preempted by the NLRA if it were interpreted to preclude a public authority from entering into a PLA. The court concluded that even under this interpretation, "the statute is not * * * preempted by the NLRA because the State is not acting as a market regulator but rather is acting as a market participant." The gist of the court's reasoning is that the state, acting as proprietor, may choose whether to enter into a PLA without running afoul of the NLRA, and that this choice need not be made on a project-by-project basis. Instead, the state may do as it has done in R.C. Chapter 4116, which is "to choose, in a summary manner, never to enter into a PLA on any public construction project when it acts as a market participant." And since "[t]he statute does not impinge on the rights of any [private] entity to enter into a PLA * * *, it does not frustrate the intent of Congress to permit the use or non-use of PLAs to be 'controlled by the free play of economic forces.' "

4

**{¶12}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

**{¶13}** When Governor Taft announced his intention to allow Am.H.B. No. 101 to become law without his signature, he explained:

**{¶14}** "I am concerned that this legislation would not survive a constitutional challenge based on the supremacy clause of the U.S. Constitution. Our legal research shows the courts have, in the past, found that the regulation of project labor agreements is a federal responsibility under the National Labor Relations Act and that the state is therefore preempted from legislating in this area." Communications Release (June 30, 1999), Office of the Governor.

**{¶15}** For the reasons that follow, we agree with the Governor's assessment of Am.H.B. No. 101's constitutionality and hold that Sections 8(e) and (f) of the NLRA, as enacted by the 1959 Landrum-Griffin Act, Sections 158(e) and (f), Title 29, U.S.Code, preempt R.C. Chapter 4116's blanket prohibition against the enforcement of PLAs on public works.

**{¶16}** Section 8(e) of the NLRA provides:

**{¶17}** "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of

a building, structure, or other work." (Italics sic.) Section 158(e), Title 29, U.S.Code.

{¶18} Section 8(e) is aimed at so-called "hot cargo" agreements, that is, agreements between a union and employer that require the employer to boycott the goods or services of another party. *Natl. Labor Relations Bd. v. Internatl. Longshoremen's Assn., AFL-CIO* (1985), 473 U.S. 61, 74-75, 105 S.Ct. 3045, 87 L.Ed.2d 47. Prior to 1959, the NLRA provided certain protections against secondary boycotts, but there were gaps in those protections. In particular, Section 8(b)(4)(A) prohibited a union from engaging in certain concerted activity to force an employer to cease doing business with a third party. See 61 Stat. 141. In *Local 1976, United Bhd. of Carpenters & Joiners of Am. v. Natl. Labor Relations Bd.* (1958), 357 U.S. 93, 98-99, 78 S.Ct. 1011, 2 L.Ed.2d 1186 ("*Sand Door*"), the United States Supreme Court indicated that a union was nevertheless free to persuade an employer to enter into a hot-cargo agreement so long as it refrained from prohibited concerted activity, and that an employer was legally permitted to comply with such an agreement as long as compliance was voluntary. "Section 8(e), which prohibits hot cargo agreements, was designed to eliminate the loophole created by the *Sand Door* decision." *Woelke & Romero Framing, Inc. v. Natl. Labor Relations Bd.* (1982), 456 U.S. 645, 655, 102 S.Ct. 2071, 72 L.Ed.2d 398.

{¶19} However, the construction-industry proviso to Section 8(e) was inserted to ensure that agreements limiting the contracting of construction site work remained legal. "To the extent that subcontracting agreements were part of the pattern of collective bargaining in the construction industry [prior to 1959], and lawful, Congress wanted to ensure that they remained lawful." *Woelke*, 456 U.S. at 657, 102 S.Ct. 2071, 72 L.Ed.2d 398.

{¶20} In *Woelke*, the Supreme Court considered whether the construction-industry proviso applied to protect two union signatory subcontracting clauses that were sought or negotiated in the context of a collective bargaining relationship. One of these clauses would have barred a construction contractor from subcontracting "any work to be done at the site of construction, * * * except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement." Id., 456 U.S. at 649, 102 S.Ct. 2071, 72 L.Ed.2d 398, fn. 1. The other provided that "[e]mployers shall not contract any work covered by this Agreement to be done at the site of the construction * * * to any person, firm or company who does not have an existing labor agreement with the Union covering such work." Id., 456 U.S. at 650, 102 S.Ct. 2071, 72 L.Ed.2d 398, fn. 3. Finding "ample evidence [in the legislative history] that Congress believed that union signatory contract clauses of the type at issue here were part of the pattern of collective bargaining in the construction industry," the court in *Woelke* affirmed the decision of the court of appeals "insofar as it holds that the clauses at issue here were sheltered by the proviso." Id., 456 U.S. at 666, 102 S.Ct. 2071, 72 L.Ed.2d 398.

{¶21} Section 8(f), which was also added to the NLRA by the 1959 Landrum-Griffin Act, Section 158(f), Title 29, U.S.Code, states:

{¶22} "It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members * * * because (1) the majority status of such labor organization has not been established under the provisions of Section 9 of this Act [Section 159, Title

29, U.S.Code] prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: * * * *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to Section 9(c) or 9(e) [Section 159(c) or (e), Title 29, U.S.Code]."  (Italics sic.)

{¶23} Section 8(f) authorizes so-called "prehire" agreements in the construction industry.  "Thus, § 8(f) allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under § 9 of the Act."  *Jim McNeff, Inc. v. Todd* (1983), 461 U.S. 260, 266, 103 S.Ct. 1753, 75 L.Ed.2d 830.

{¶24} Although not entirely coincident, there is a corresponding relationship between the requirements that Section 8(f) permits to be imposed under a prehire agreement and the union signatory subcontracting clauses that are sheltered by the construction industry proviso to Section 8(e).  On the one hand, unions often seek protected Section 8(e) subcontracting clauses as part of a Section 8(f) prehire agreement.  Indeed, Section 8(f) agreements are "the most common and possibly the only effective means by which such [subcontracting

8

clauses] may be obtained." *Donald Schriver, Inc. v. Natl. Labor Relations Bd.* (C.A.D.C.1980), 635 F.2d 859, 875. On the other hand, "[w]hen a union obtains a subcontracting clause from a general contractor, subcontractors frequently attempt to ensure that they remain eligible for work by entering into a § 8(f) agreement—known as a prehire agreement—with the union." *Woelke*, supra, 456 U.S. at 664, 102 S.Ct. 2071, 72 L.Ed.2d 398.

**{¶25}** In *Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contrs. of Massachusetts/Rhode Island, Inc.* (1993), 507 U.S. 218, 230-231, 113 S.Ct. 1190, 122 L.Ed.2d 565 ("*Boston Harbor*"), the high court explained:

**{¶26}** "In 1959, Congress amended the NLRA to add § 8(f) and modify § 8(e). Section 8(f) explicitly permits employers in the construction industry—but no other employers—to enter into prehire agreements. Prehire agreements are collective-bargaining agreements providing for union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees. [*Assoc. Builders & Contrs. of Massachusetts/Rhode Island v. Massachusetts Water Resources Auth.*] 935 F.2d [345], at 356 [1991] [case below]; *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 265-266 [103 S.Ct. 1753, 75 L.Ed.2d 830] (1983). The 1959 amendment adding a proviso to subsection (e) permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement. See *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 657 [102 S.Ct. 2071, 72 L.Ed.2d 398] (1982). Section 8(f) contains a final provision that permits employees, once hired, to utilize the NLRB election process under §§ 9(c) and (e) of the Act, 29 U.S.C. §§ 159(c) and (e), if they wish to reject the bargaining representative or to cancel

the union security provisions of the prehire agreement. See *NLRB v. Iron Workers*, 434 U.S. 335, 345 [98 S.Ct. 651, 54 L.Ed.2d 586] (1978).

**{¶27}** "* * *

**{¶28}** "It is evident from the face of the statute that in enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor's need for predictable costs and a steady supply of skilled labor, and a long-standing custom of prehire bargaining in the industry. See S.Rep. No. 187, 86[th] Cong., 1[st] Sess., 28, 55-56 (1959); H.R.Rep. No. 741, 86[th] Cong., 1[st] Sess., 19-20 (1959) [1959 U.S.Code Cong. & Admin. News p. 2318]."

**{¶29}** The prehire collective bargaining agreement that was held to be a valid labor contract under Sections 8(e) and (f) in *Boston Harbor* was a PLA prescribing the terms and conditions of employment at a public construction site. That agreement, which was negotiated between the project manager and the building and construction trades council ("BCTC") and then incorporated into a Massachusetts state agency's solicitation of project bids, contained the following requirements: "recognition of BCTC as the exclusive bargaining agent for all craft employees; use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union-security provisions compelling them to become union members within seven days of their employment; the primary use of BCTC's hiring halls to supply the project's craft labor force; a 10-year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the Agreement." Id., 507 U.S. at 221-222, 113 S.Ct. 1190, 122 L.Ed.2d 565. Quoting Chief Judge Breyer's dissent in the court of appeals, the Supreme Court found that this is " 'the very

10

sort of labor agreement that Congress explicitly authorized and expected frequently to find.' " Id., 507 U.S. at 233, 113 S.Ct. 1190, 122 L.Ed.2d 565.

**{¶30}** This is also the very sort of labor agreement that the board was attempting to negotiate with CBCTC when Am.H.B. No. 101 was passed by the General Assembly and forwarded to the Governor. As enacted by Am.H.B. No. 101, R.C. 4116.02 provides:

**{¶31}** "A public authority, when engaged in procuring products or services, awarding contracts, or overseeing procurement or construction for public improvements, shall ensure that bid specifications issued by the public authority for the proposed public improvement, and any subsequent contract or other agreement for the public improvement to which the public authority and a contractor or subcontractor are direct parties, do not require a contractor or subcontractor to do any of the following:

**{¶32}** "(A) Enter into agreements with any labor organization on the public improvement;

**{¶33}** "(B) Enter into any agreement that requires the employees of that contractor or subcontractor to do either of the following as a condition of employment or continued employment:

**{¶34}** "(1) Become members of or affiliated with a labor organization;

**{¶35}** "(2) Pay dues or fees to a labor organization."

**{¶36}** R.C. 4116.03 provides:

**{¶37}** "No public authority shall do any of the following:

**{¶38}** "(A) Award a contract for a public improvement in violation of section 4116.02 of the Revised Code;

**{¶39}** "(B) Discriminate against any bidder, contractor, or subcontractor for refusing to become a party to any agreement with any labor organization on

the public improvement that currently is under bid or on projects related to that improvement;

{¶40} "(C) Otherwise violate section 4116.02 of the Revised Code."

{¶41} Yet the court of appeals found no "real controversy" in this case because R.C. Chapter 4116 "does not * * * prohibit a public authority from entering into a PLA." Instead, the court found that the statute restricts a public authority only from "entering into a PLA with objectionable terms," that is, a PLA that requires a contractor or its employees to do any of those things listed in R.C. 4116.02(A) and (B). The court reasoned that "these very terms are [not] essential to * * * an effective PLA. On the contrary, a PLA can be drafted without these terms and still be valid and enforceable." Thus, "the statute's restrictions do not effectively prohibit a public authority from entering into a PLA."

{¶42} This result is surprising, considering that the sponsor of Am.H.B. No. 101, Rep. Ron Young (R-Leroy), in his testimony for the bill before the House Commerce and Labor Committee, specifically maintained that "[t]his important legislation will prohibit so-called 'project labor agreements' in the State of Ohio" and then proceeded to argue at length as to why "project labor agreements should be prohibited in Ohio."

{¶43} In any event, we fail to see the relevance of hypothetical prehire agreements that neither trigger the prohibitions in R.C. 4116.02 nor require the shelter of the construction industry exceptions in Section 8 of the NLRA. This case does not involve some abstract or theoretical PLA that imposes none of the requirements or restrictions prohibited under R.C. Chapter 4116. In this case, the board and CBCTC were attempting to negotiate an agreement that would incorporate the very requirements that the statute prohibits. They are now asking whether the NLRA preempts the state from prohibiting this specific type of

agreement and, with all due respect to the court of appeals, it is no answer to tell them that R.C. Chapter 4116 permits a different type of agreement.

**{¶44}** As others have observed, the court of appeals' position in this case "might be reasonable but for the fact that these 'objectionable terms' prohibited by [R.C. Chapter 4116] * * * are precisely the sorts of outcomes guaranteed to the construction industry through NLRA 8[f] pre-hire agreements." John Lund and Joe Oswald, Public Project Labor Agreements: Lessons Learned, New Directions (Fall 2001), 26 Lab.Stud.J. 1, 3. Regardless of whether R.C. Chapter 4116 leaves public authorities free to enforce some hypothetical PLA that is not involved in the present controversy, the fact remains that the statute expressly prohibits "the very sort of labor agreement that Congress explicitly authorized and expected frequently to find." *Boston Harbor,* supra, 507 U.S. at 233, 113 S.Ct. 1190, 122 L.Ed.2d 565. Thus, we find that there is a "real controversy" in this case as to whether R.C. Chapter 4116 is preempted by the NLRA.

**{¶45}** Accordingly, it must be decided whether the NLRA precludes state regulation of PLAs in the construction industry and, if so, whether R.C. Chapter 4116 is tantamount to regulation or constitutes proprietary conduct on the part of the state.

**{¶46}** "Congress' power to pre-empt state law is derived from the Supremacy Clause of Art. VI of the Federal Constitution." *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 208, 105 S.Ct. 1904, 85 L.Ed.2d 206. "In any case concerning preemption, congressional purpose must be the ultimate focus. *Malone v. White Motor Corp.* (1978), 435 U.S. 497, 504, 98 S.Ct. 1185, 1189-1190, 55 L.Ed.2d 443, 450. The National Labor Relations Act ('NLRA') contains no express preemption provision. 'Where the pre-emptive effect of federal enactments is not explicit, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern

from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' " ' *Metro. Life Ins. Co. v. Massachusetts* (1985), 471 U.S. 724, 747-748, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728, 745, quoting *Allis-Chalmers Corp.* [supra], 471 U.S. [at] 209, 105 S.Ct. [at] 1910, 85 L.Ed.2d [at] 213-214." *J.A. Croson Co. v. J.A. Guy, Inc.* (1998), 81 Ohio St.3d 346, 350, 691 N.E.2d 655.

{¶47} But deciphering the extent to which national policy under the NLRA displaces state law requires "a more complicated and perceptive process than is conveyed by the delusive phrase, 'ascertaining the intent of the legislature.' " *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon* (1959), 359 U.S. 236, 239-240, 79 S.Ct. 773, 3 L.Ed.2d 775. Congress has established in the NLRA a comprehensive and integrated regulatory framework. In its attempt to devise workable NLRA preemption rules, the Supreme Court has necessarily "been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administration." Id., 359 U.S. at 243, 79 S.Ct. 773, 3 L.Ed.2d 775.

{¶48} Under this scheme, "Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency [the National Labor Relations Board], armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." Id. at 242, 79 S.Ct. 773, 3 L.Ed.2d 775. Thus, "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. * * * Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776* (1953), 346 U.S. 485,

490, 74 S.Ct. 161, 98 L.Ed. 228. The rationale for NLRA preemption, therefore, is based largely on the notion that "when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy." *Amalgamated Assn. of Street, Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge* (1971), 403 U.S. 274, 288, 91 S.Ct. 1909, 29 L.Ed.2d 473.

**{¶49}** Nevertheless, Congress has neither exercised its full authority to occupy the entire field in the area of labor relations nor clearly delineated the extent to which state regulation must yield to this subordinating federal legislation. See *Weber v. Anheuser-Busch, Inc.* (1955), 348 U.S. 468, 480-481, 75 S.Ct. 480, 99 L.Ed. 546. As the high court went on to explain in *Lockridge*, supra, 403 U.S. at 289-291, 91 S.Ct. 1909, 29 L.Ed.2d 473:

**{¶50}** "This has, quite frankly, left the Court with few available options. We cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States. Nor can we proceed on a case-by-case basis to determine whether each particular final judicial pronouncement does, or might reasonably be thought to, conflict in some relevant manner with federal labor policy. This Court is ill-equipped to play such a role and the federal system dictates that this problem be solved with a rule capable of relatively easy application * * *. Further, it is surely not possible for this Court to treat the National Labor Relations Act section by section, committing enforcement of some of its provisions wholly to the NLRB and others to the concurrent domain of local law. Nothing in the language or underlying purposes of the Act suggests any basis for such distinctions. Finally, treating differently judicial power to deal with conduct protected by the Act from that prohibited by it would likewise be

unsatisfactory. Both areas equally involve conduct whose legality is governed by federal law, the application of which Congress committed to the Board, not courts.

{¶51} "* * * In fact, varying approaches were taken by the Court in initially grappling with this pre-emption problem. Thus, for example, some early cases suggested the true distinction lay between judicial application of general common law, which was permissible, as opposed to state rules specifically designed to regulate labor relations, which were pre-empted. * * * Others made pre-emption turn on whether the States purported to apply a remedy not provided for by the federal scheme, * * * while in still others the Court undertook a thorough scrutiny of the federal Act to ascertain whether the state courts had, in fact, arrived at conclusions inconsistent with its provisions * * *. For the reasons outlined above none of these approaches proved satisfactory, however, and each was ultimately abandoned. It was, in short, experience—not pure logic—which initially taught that each of these methods sacrificed important federal interests in a uniform law of labor relations centrally administered by an expert agency without yielding anything in return by way of predictability or ease of judicial application.

{¶52} "The failure of alternative analyses and the interplay of the foregoing policy considerations, then, led this Court to hold in *Garmon*, 359 U.S., at 244 [79 S.Ct. 773, 3 L.Ed.2d 775]:

{¶53} " 'When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation

16

involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.' " (Footnote omitted.)

**{¶54}** This line of preemption analysis, which is known as "*Garmon* preemption," "protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." *Metro. Life Ins. Co. v. Massachusetts*, supra, 471 U.S. at 748, 105 S.Ct. 2380, 85 L.Ed.2d 728. When an activity "is arguably within the compass of § 7 or § 8 of the Act, the State's jurisdiction is displaced." *Garmon*, 359 U.S. at 246, 79 S.Ct. 773, 3 L.Ed.2d 775. States may not, therefore, "regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry, Labor & Human Relations v. Gould, Inc.* (1986), 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223.

**{¶55}** *Garmon* preemption does not, of course, apply where the activity sought to be locally regulated falls beyond the arguable reach of Sections 7 and 8 of the NLRA. But it does not necessarily follow that activities ungoverned by these sections are, therefore, controllable by the states. The NLRA does more than indicate Congress's desire for centralized administration and uniformity in the application of its provisions. It also reveals that certain concerted activities were intentionally left unprotected and unrestricted under the Act because Congress meant for them to be unfettered by the exercise of *any* governmental or regulatory power, including that of the NLRB. "By the Taft-Hartley Act, * * * Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces." *Weber v. Anheuser-Busch, Inc.*, supra, 348 U.S. at 480, 75 S.Ct. 480, 99 L.Ed. 546.

**{¶56}** Thus, the Supreme Court has recognized "a second line of pre-emption analysis * * * in cases focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left 'to be

controlled by the free play of economic forces.' " *Lodge 76, Internatl. Assn. of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Emp. Relations Comm.* (1976), 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 ("*Machinists*"), quoting *Natl. Labor Relations Bd. v. Nash-Finch Co.* (1971), 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328. This analysis reflects the NLRA's broader purpose of restoring an equality of bargaining power between labor and management and is invoked primarily in cases involving the use of certain self-help economic weapons to which the parties occasionally resort in an effort to advance their respective bargaining goals. See *Machinists*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (concerted refusal to work overtime); *Gould*, supra, 475 U.S. at 290, 106 S.Ct. 1057, 89 L.Ed.2d 223 (boycott of repeat labor law violators). States are prohibited from imposing additional restrictions on economic weapons of self-help such as strikes or lockouts. *Golden State Transit Corp. v. Los Angeles* (1986), 475 U.S. 608, 615, 106 S.Ct. 1395, 89 L.Ed.2d 616 ("*Golden State I*"); *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton* (1964), 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (peaceful secondary picketing).

{¶57} As explained in *Machinists*, "[T]hese activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful.' [*Natl. Labor Relations Bd. v. Ins. Agents' Internatl. Union, AFL-CIO* (1960), 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed.2d 454.] Rather, both are without authority to attempt to 'introduce some standard of properly "balanced" bargaining power,' [id. at 497, 80 S.Ct. 419, 4 L.Ed.2d 454] or to define 'what economic sanctions might be permitted negotiating parties in an "ideal" or "balanced" state of collective bargaining.' [Id. at 500, 80 S.Ct. 419, 4 L.Ed.2d 454.]" *Machinists*, 427 U.S. at 149-150, 96 S.Ct. 2548, 49 L.Ed.2d 396. Thus,

"[t]he *Machinists* rule creates a free zone from which all regulation * * * is excluded." *Golden State Transit Corp. v. Los Angeles* (1989), 493 U.S. 103, 111, 110 S.Ct. 444, 107 L.Ed.2d 420 ("*Golden State II*").

{¶58} We are initially urged by the state to find that neither *Garmon* nor *Machinists* provides the appropriate analytic framework for deciding this case. According to the state, "*Garmon* preemption does not apply to activity that is merely permissible under section 8 of the NLRA," but instead applies only to "activity protected by section 7 of the NLRA." Thus, the state reasons, "*Garmon* preemption does not preempt R.C. [Chapter] 4116" because "prehire agreements * * * [are not] protected pursuant to section 7." We disagree.

{¶59} As our discussion of *Garmon* and its progeny indicates, the various references made by the Supreme Court to those activities "protected by § 7" or "prohibited under § 8" are not by way of limitation. The high court has time and again varied the language it used to indicate that this form of preemption applies when an activity is, e.g., "covered" or "governed by" "the subject of," or "arguably" or "potentially subject to" or "within the compass of § 7 or § 8." In any event, there is certainly nothing that prevents Congress from choosing to protect an activity by way of exemption under Section 8 rather than by inclusion in Section 7, and we doubt seriously that the high court would, or could, preclude Congress from structuring its own legislation. Moreover, it was the very construction-industry provisions embodied in Section 8 of the NLRA that the high court was relying on when it stated in *Boston Harbor* that "Congress explicitly authorized" PLAs. Id., 507 U.S. at 233, 113 S.Ct. 1190, 122 L.Ed.2d 565.

{¶60} The state also maintains that "*Machinists* preemption is completely inapplicable to R.C. [Chapter] 4116." According to the state, this form of preemption applies only where there is a labor dispute, and since appellants "have never identified a labor dispute * * * involving the negotiation of a PLA for the

Cuyahoga County Juvenile Detention/Intervention Center * * *, there [is no] occasion * * * to consider whether *Machinists* preemption applies to R.C. [Chapter] 4116." The state takes the position that the *Machinists* rule is designed and applies only to protect against the regulation of "particular economic weapons, such as strikes and lockouts" and challenges appellants "to explain how PLAs constitute economic weapons." Moreover, the state continues, "economic weapons describe tactics," whereas "union-only PLAs are not a tactic at all, but rather an outcome."

{¶61} The problem with the state's analysis is that it draws on certain principles that are ultimately incompatible with its current position. The NLRA's stated purpose is to remedy "[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association." Section 151, Title 29, U.S.Code. The NLRA seeks to restore a more equitable balance of bargaining power "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." Id. In Sections 7 and 8 of the NLRA (Sections 157 and 158, Title 29, U.S.Code) Congress established a desired balance of bargaining power by protecting certain labor activities, prohibiting others, and leaving still others to be controlled by the free play of economic forces. The *Machinists* doctrine protects activity in the third category against governmental regulation so as to preserve the balance of power that Congress has struck between labor and management in the NLRA.

{¶62} In *Machinists,* the court explained that "state attempts to influence the substantive terms of collective-bargaining agreements are * * * inconsistent

20

with the federal regulatory scheme * * *. And indubitably regulation * * * of 'the choice of economic weapons that may be used as part of collective bargaining [exerts] considerable influence upon the substantive terms on which the parties contract.' " Id., 427 U.S. at 153, 96 S.Ct. 2548, 49 L.Ed.2d 396, quoting *Natl. Labor Relations Bd. v. Ins. Agents',* supra, 361 U.S. at 490, 80 S.Ct. 419, 4 L.Ed.2d 454. The Supreme Court has since noted, however, that while "[s]uch analysis initially had been used to determine whether certain weapons of bargaining neither protected by § 7 nor forbidden by § 8(b) could be subject to state regulation * * *, [i]t has been used more recently to determine the validity of state rules of general application that affect the right to bargain or to self-organization." *Metro. Life Ins. Co.*, supra, 471 U.S. at 749, 105 S.Ct. 2380, 85 L.Ed.2d 728, fn. 27.

{¶63} In determining whether state laws of general application are preempted under *Machinists*, the Supreme Court has indeed recognized that a distinction should be drawn between state regulation that interferes with the collective bargaining process itself and state regulation that affects only the substantive terms of collective bargaining agreements. "The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metro. Life*, 471 U.S. at 753, 105 S.Ct. 2380, 85 L.Ed.2d 728. Thus, there is no inconsistency between the NLRA, which is "designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA." Id., 471 U.S. at 754-755, 105 S.Ct. 2380, 85 L.Ed.2d 728.

{¶64} These same principles dictate a different result, however, with regard to the attempted regulation of PLAs in the construction industry. Given the 1959 amendments to the NLRA that added the construction industry exemptions to Section 8, it cannot be said that Congress is unconcerned with the substantive terms of construction-industry PLAs. To the contrary, these provisions not only address and authorize particular terms and conditions of employment, but also reflect Congress's intent to strike a slightly different balance of power in order to accommodate conditions endemic to that industry. In this regard, we are no longer attempting to ascertain the implications of congressional silence, which is usually the situation in a *Machinists* analysis. Instead, we are dealing with an explicit congressional directive to leave construction-industry PLAs to the operation of economic forces.

{¶65} Moreover, state laws of general application usually withstand *Machinists* scrutiny because "[m]ost significantly, there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization." *Metro. Life Ins. Co.*, 471 U.S. at 756, 105 S.Ct. 2380, 85 L.Ed.2d 728. In contrast, Congress believed that PLAs were both lawful and part of the bargaining process in the construction industry prior to 1959, and enacted the construction-industry exemptions specifically to preserve this pattern and practice. Any state regulatory action that interferes with this pattern of collective bargaining in the construction industry would, therefore, be incompatible with the goals of the NLRA.

{¶66} Thus, it is of little consequence whether a PLA is characterized as "an outcome" or an "economic weapon," for it is exactly the sort of practice that Congress has preserved for the construction industry. And in any event, the Supreme Court has already indicated that a *Machinists* analysis would apply in

22

determining the validity of regulatory prohibitions of public-construction PLAs. See *Boston Harbor*, supra, 507 U.S. at 232, 113 S.Ct. 1190, 122 L.Ed.2d 565.

**{¶67}** The state also argues that even if the NLRA is deemed to authorize certain kinds of PLAs in the construction industry, there is no indication that the 1959 amendments "were intended to codify any activity other than labor organizations' direct dealings with private sector contractors and subcontractors." Similarly, amicus curiae Ohio Associated Builders & Contractors, Inc., argues that "[b]ecause §§ 8(e) and 8(f) apply only to 'employers,' and public entities are not 'employers' under the NLRA, the provisions applicable to 'employers in the construction industry' found in §§ 8(e) and (f) simply do not apply [to] the State of Ohio and its political subdivisions."

**{¶68}** However, as the high court explained in *Boston Harbor*, "Of course, the exceptions provided for the construction industry in §§ 8(e) and (f), like the prohibitions from which they provide relief, are not made specifically applicable to the State. This is because the State is excluded from the definition of the term 'employer' under the NLRA, see 29 U.S.C. § 152(2) * * *. Nevertheless, the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections." Id., 507 U.S. at 230-231, 113 S.Ct. 1190, 122 L.Ed.2d 565.

**{¶69}** At this juncture, we must conclude that Section 8(f) and the construction-industry proviso to Section 8(e) are clear manifestations of Congress's intent to preclude the states from regulating PLAs in the construction industry. Whether Congress also intended to preclude the NLRB from doing so is not an issue we need to decide. The jurisdiction of the NLRB to regulate construction-industry PLAs is not implicated in the present controversy. Thus, it makes no further difference whether we engage in a *Garmon* or *Machinists*

analysis. The application of either rule necessitates a withdrawal of state power, except where the state acts as a market participant.

**{¶70}** This brings us to the final and decisive issue in this case, which is whether R.C. Chapter 4116 amounts to government regulation or constitutes proprietary conduct on the part of the state.

**{¶71}** In *Boston Harbor*, the Supreme Court held that the NLRA does not prevent a state agency from enforcing a PLA covering a particular public project. In so holding, the court explained:

**{¶72}** "When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists*, or for NLRB jurisdiction, see *Garmon*. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*." (Emphasis sic.) Id., 507 U.S. at 226-227, 113 S.Ct. 1190, 122 L.Ed.2d 565.

**{¶73}** The Supreme Court found that its "decisions in this area support the distinction between government as regulator and government as proprietor." Id. at 227, 113 S.Ct. 1190, 122 L.Ed.2d 565. The high court also found that the differences between private and state action "are far less significant when the State acts as a market participant with no interest in setting policy." Id. at 229, 113 S.Ct. 1190, 122 L.Ed.2d 565. The court then posed the question "whether a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not 'tantamount to regulation' or policymaking." Id.

**{¶74}** Answering this question in the affirmative, the court explained:

**{¶75}** "Permitting the States to participate freely in the marketplace is not only consistent with NLRA pre-emption principles generally but also, in these cases, promotes the legislative goals that animated the passage of the §§ 8(e) and (f) exceptions for the construction industry.

**{¶76}** "* * *

**{¶77}** "There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction." (Emphasis sic.) Id., 507 U.S. at 230 and 231-232, 113 S.Ct. 1190, 122 L.Ed.2d 565.

**{¶78}** Critically, however, *Boston Harbor* suggests that a state would be acting as a regulator or policymaker, rather than as a purchaser, proprietor, or market participant, were it to impose an across-the-board rule that either requires or prohibits the use of PLAs on all public construction projects. Thus, the court carefully noted, on the one hand, that "the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project," and indicated, on the other hand, that "denying an option to public owner-developers that is available to private owner-developers itself places a restriction on

Congress' intended free play of economic forces identified in *Machinists*." *Boston Harbor*, 507 U.S. at 232, 113 S.Ct. 1190, 122 L.Ed.2d 565.

{¶79} Several courts considering this issue have reached similar conclusions. In *United States Chamber of Commerce v. Reich* (C.A.D.C.1996), 74 F.3d 1322, the court held that the NLRA preempted a 1995 executive order issued by former President Clinton that barred the contracting agencies of the federal government from contracting with employers who permanently replace lawfully striking workers. The district court had upheld the executive order, finding that NLRA preemption is inapplicable because the government was acting in a proprietary capacity. According to the appellate court, the district court had interpreted *Boston Harbor* "as suggesting that if a private contractor were permitted to refuse to buy goods from an employer who permanently replaced strikers—which ordinarily he would be—then so should the federal government." Id., 74 F.3d at 1336. The government, in its arguments, had referred by analogy to two executive orders that were issued by former President Bush in 1992, one of which barred government contractors from entering into Section 8(f) prehire agreements, but neither of which had ever been challenged in court.

{¶80} In dealing with these contentions, the appellate court explained as follows:

{¶81} "The premise on which the [*Boston Harbor*] Court's * * * analysis [of the character of the state's actions] rested, then, was that the Massachusetts governmental entity [the Water Resources Authority], was not seeking to set general policy in the Commonwealth; it was just trying to operate as if it were an ordinary general contractor whose actions were 'specifically tailored to one particular job, the Boston Harbor clean-up project.' Id. at 232, 113 S.Ct. at 1198, 122 L.Ed.2d 565. Surely, the result would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law or the Governor had

issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements with the BCTC or its Massachusetts-wide counterpart containing § 8(e) pre-hire agreements. Accordingly, we very much doubt the legality of President Bush's Executive Order 12,818—since revoked, but upon which the government relies—that banned government contractors from entering into pre-hire agreements under § 8(f).

{¶82} "It does not seem to us possible to deny that the President's Executive Order [in this case] seeks to set a broad [labor] policy * * *.  The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter. * * * Whatever one's views on the issue, it surely goes to the heart of United States labor relations policy.  It cannot be equated to the *ad hoc* contracting decision made by MWRA in seeking to clean up Boston Harbor." (Footnotes omitted.)  Id., 74 F.3d at 1336-1337.

{¶83} In *Colfax Corp. v. Illinois State Toll Hwy. Auth.* (C.A.7, 1996), 79 F.3d 631, the court determined that the NLRA does not prevent the Authority from entering into a multiproject labor agreement that requires successful bidders to become parties to areawide collective bargaining agreements with the unions having jurisdiction over the relevant work.  Despite the scope of these agreements, the court found them to be more akin to the job-specific agreement allowed in *Boston Harbor* than the debarment statute struck down in *Gould*.  "The case before us * * * is much more like '*Boston Harbor*.'  Illinois has not enacted a statute [requiring PLAs on all public projects].  The Authority has not passed [such] a general rule."  Id., 79 F.3d at 634.  The court cautioned, however, that it would refrain from questioning the Authority's motives in these kinds of cases

only "[s]o long as * * * the frontier is pushed no farther from '*Boston Harbor*' than it is here." Id., 79 F.3d at 635.

{¶84} In *Assoc. Builders & Contrs., Inc. v. San Francisco Airports Comm.* (1999), 21 Cal.4th 352, 87 Cal.Rptr.2d 654, 981 P.2d 499, the Supreme Court of California held that the Airports Commission did not violate that state's statute declaring the right of self-organization when it entered into a PLA in order to complete an expansion and renovation project involving the San Francisco International Airport. In so holding, the court explained that "ABC's argument fails to come to terms with the supremacy of federal labor law, embodied in 29 United States Code section 158(f), which permits prehire agreements in the construction industry. Any California law purporting to bar such agreements would raise serious questions of preemption under *Machinists* * * *, which prohibits state and municipal regulation of areas that have been left ' "to be controlled by the free play of economic forces." ' " Id., 21 Cal.4th at 379, 87 Cal.Rptr.2d 654, 981 P.2d 499.

{¶85} In *Assoc. Builders & Contrs. of Rhode Island, Inc. v. Providence* (D.R.I.2000), 108 F.Supp.2d 73, the court found the NLRA to preempt a city ordinance giving favorable tax treatment only to developers who execute PLAs on private construction projects with certain affiliated unions. The city claimed that it was acting as a co-developer of the projects by making a contribution in the way of tax stabilization and that because its motives were labor-neutral, it should be found to have acted in a proprietary capacity pursuant to *Boston Harbor*. After declining to "adopt the novel position that the City's alleged labor policy-neutral motive can somehow transform its action into a form of market participation worthy of *Boston Harbor* protection," 108 F.Supp.2d at 83, the court went on to explain:

{¶86} "Even if the grant of favorable tax treatment may in some circumstances be considered participation in the marketplace or if a labor-neutral motive may save some non-proprietary governmental action from preemption, this case is not a good candidate for the application of those propositions. The City's action in this case is not limited to one particular project, but is rather a policy to be implemented on several projects. This distinction has been important to courts refusing to apply the market participant exception, because a policy, regardless of the motive behind it, is more 'regulatory' than 'proprietary' in nature than a single contracting or, in this case, taxing decision." Id., 108 F.Supp.2d at 83-84.

{¶87} Thus, as one writer succinctly stated, "state procurement law that does not allow project labor agreements on public works projects at all is a flat prohibition and thus takes state agencies out of any function as private purchasers of services and is 'tantamount to regulation.' " Henry H. Perritt, Jr., Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's *Boston Harbor* Decision (1996), 12 Lab.Law. 69, 88.

{¶88} On the other hand, two cases have held to the contrary. In *George Harms Constr. Co., Inc. v. New Jersey Turnpike Auth.* (1994), 137 N.J. 8, 644 A.2d 76, the Supreme Court of New Jersey found that the NLRA does not preempt a state from prohibiting PLAs on public projects. The court reasoned:

{¶89} "Thus, under *Boston Harbor*, federal labor law does not prohibit a state entering the construction market from using the same construction-industry exception regarding project-labor agreements that private purchasers of construction labor use. However, a state's laws may prohibit a project-labor-agreement specification in public contracts without running afoul of the NLRA. *Garmon* preemption does not apply because a state-law prohibition of project-labor agreements on public projects is merely one way in which a state may choose to act as a market participant in the construction industry. In other words,

a state may choose to enter or not to enter a project-labor agreement just like any other purchaser of construction services. *Machinists* preemption also does not apply because a state-law prohibition of project-labor agreements on public projects does not constitute impermissible regulation of an area that the NLRA contemplated would be left to the free play of economic forces. Such a prohibition amounts to nothing more than the public equivalent of a corporation's by-law regarding the purchase of construction services. In short, when a state uses project-labor agreements on public projects, it is not acting as a regulator of private actors; rather, it is merely defining its role as a proprietor/purchaser of labor in the construction industry." Id., 137 N.J. at 26-27, 644 A.2d 76.

{¶90} Similarly, in *Bldg. & Constr. Trades Dept., AFL-CIO v. Allbaugh* (C.A.D.C. 2002), 295 F.3d 28, petition for certiorari filed Oct. 2, 2002, 71 U.S.L.W. 3283, No. 02-527, the court held that the NLRA does not preempt Executive Order 13,202, 66 F.R. 11225, issued by President George W. Bush on February 17, 2001, which prohibits federal agencies or recipients of federal funding from requiring or prohibiting PLA's in the bid specifications or other authorizing documents for construction projects. In so holding, the court never explained the obvious inconsistency between this decision and its previous discussion in *Reich*, supra, 74 F.3d at 1336-1337, regarding the legality of former President Bush's Executive Order 12,818. Instead, the court essentially reasoned, as did the New Jersey high court in *George Harms Constr. Co., Inc.*, that the government acts as a proprietor, rather than a regulator, when it makes "just 'the type of decision regarding the use of labor agreements that a private project owner would be free to make.' " *Allbaugh*, 295 F.3d at 35, quoting the government's brief. According to the court, the government has acted in a propriety capacity despite the "blanket, across-the-board" prohibition of Executive Order 13,202 " because " 'the only decisions governed by the executive order are those that the

federal government makes as [a] market participant.' " Id., quoting the government's brief.

**{¶91}** This reasoning, we believe, places the proverbial cart before the horse. These courts assume that a state acts as a market participant by doing what a private actor may do under the NLRA. But the gist of *Boston Harbor* is that a state may act as a private contractor would act *when it acts as a market participant*. Otherwise, the state would be permitted to regulate within a protected zone because a private actor may do so. As the New Jersey Supreme Court points out, for example, a private corporation may in its bylaws or elsewhere decide as a matter of policy never to utilize a PLA when purchasing construction services without running afoul of the NLRA. But this is not because such a decision is inherently indicative of proprietary activity. Indeed, the private contractor-developer in this situation would be acting not as a typical contractor would act in the furtherance of its proprietary interests, but as a "regulator" of the construction market. Instead, a private corporation or other legal entity may make such a policy decision without violating the NLRA because the NLRA does not preclude a private actor from attempting to regulate in an area reserved for market freedom or NLRB jurisdiction.

**{¶92}** Thus, as the Supreme Court explained in *Boston Harbor*:

**{¶93}** "The conceptual distinction between regulator and purchaser exists to a limited extent in the private sphere as well. A private actor, for example, can participate in a boycott of a supplier on the basis of a labor policy concern rather than a profit motive. * * * The private actor under such circumstances would be attempting to 'regulate' the suppliers and would not be acting as a typical proprietor. The fact that a private actor may 'regulate' does not mean, of course, that the private actor may be 'pre-empted' by the NLRA; the Supremacy Clause does not require pre-emption of private conduct. Private actors therefore may

'regulate' as they please, as long as their conduct does not violate the law. As the above passage in *Gould* [475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223] makes clear, however, states have a qualitatively different role to play from private parties. [Id.] When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting policy." Id., 507 U.S. at 229, 113 S.Ct. 1190, 122 L.Ed.2d 565.

{¶94} We cannot conceive of R.C. Chapter 4116 as anything but regulation. R.C. Chapter 4116 is all about labor policy. Its stated purpose is "to prohibit public authorities from imposing certain labor requirements as a condition of performing public works." Preamble to 1999 Am.H.B. No. 101. Rather than constituting proprietary conduct on the part of the state, R.C. Chapter 4116 essentially prohibits the state, its contracting authorities, and any institution supported in whole or part by public funds from engaging in proprietary activity when purchasing construction services or directly employing labor by prohibiting them from entering into or enforcing a PLA on any public construction project regardless of economic or other proprietary concerns. Indeed, as the Cuyahoga County Board of Commissioners itself bemoans, the statute "eliminates the discretion of local authorities to determine whether and when a project labor agreement would benefit local taxpayers and citizens by providing consistency and harmony in the vast array of labor and employment issues which arise during the course of a costly and time expansive public improvement project."

{¶95} R.C. Chapter 4116 is a blanket, across-the-board prohibition that precludes any sort of ad hoc determination as to the benefits or advantages of utilizing a PLA on a particular project. It is, therefore, " 'tantamount to

regulation' or policymaking." *Boston Harbor*, 507 U.S. at 229, 113 S.Ct. 1190, 122 L.Ed.2d 565.[1]

**{¶96}** Accordingly, we hold that Sections 8(e) and (f) of the National Labor Relations Act, as enacted by the 1959 Landrum-Griffin Act, Sections 158(e) and (f), Title 29, U.S.Code, preempt R.C. Chapter 4116, as enacted by Am.H.B. No. 101 of 123rd General Assembly, which flatly prohibits public authorities from entering into or enforcing project labor agreements on public construction projects.

**{¶97}** For all of the foregoing reasons, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court declaring R.C. Chapter 4116 preempted by the NLRA and enjoining its enforcement.

Judgment reversed.

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS, J., concurs separately.

MOYER, C.J., and LUNDBERG STRATTON, J., concur in syllabus and judgment.

COOK, J., concurs in judgment only.

---

[1]  Amici curiae Ohio ABC and National Right to Work Legal Defense Foundation argue that R.C. 4116.02(B) is a "right-to-work" law and, therefore, is saved from preemption by Section 14(b) of the NLRA, Section 164(b), Title 29, U.S.Code, which permits states, if they so choose, to prohibit "agreements requiring membership in a labor organization as a condition of employment." We find, however, that this is not an issue that has been properly raised in this case. As the state informs us, it "has not advanced a right-to-work argument in its defense of R.C. [Chapter] 4116" and has no interest in this "hypothetical" and "academic" debate. Instead, the state urges us to consider only those "arguments the State has actually made" and "not decide this theoretical issue." We point out also that while the court of appeals did briefly discuss Section 14(b), it did so only to bolster its view that R.C. Chapter 4116 does not "have the effect of prohibiting a public authority from entering into a PLA." In any event, we decline the invitation to construe R.C. Chapter 4116 as some cryptic prohibition of so-called "union shop" or "agency shop" agreements in Ohio. But even if we did so construe R.C. 4116.02(B), we very much doubt the applicability of Section 14(b) in the circumstances of this case. See *Assoc. Gen. Contrs. of North Dakota v. Otter Tail Power Co.* (C.A.8, 1979), 611 F.2d 684, 692-693.

_____

**DOUGLAS, J., concurring**.

{¶98} I concur with the exhaustive and well-reasoned opinion of Justice Resnick. I write in support of the majority opinion.

{¶99} When all of the layers of obfuscation of the issue now before us are peeled away, the core question is whether the state may, within constitutional limits, enact legislation that prohibits project labor agreements from being entered on public construction projects. While R.C. Chapter 4116 does just that and, by so doing, effectively takes away the discretion of local elected officials to look out for the best interest of local taxpayers and citizens, and that, on its face, is bad public policy, it is not for us to decide policy. It is our task, however, to test such legislation by the parameters laid down by case law of the United States Supreme Court, when applicable, and we are bound to follow and comply with such pronouncements.

{¶100} In this matter, the pertinent case law, which we are required to apply and follow, might very well begin and end with *Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders & Contrs. of Massachusetts/Rhode Island, Inc.* (1993), 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (the "*Boston Harbor*" case). Therein, the high court said that "[t]he 1959 amendment adding a proviso to subsection [8](e) [of the National Labor Relations Act, Section 158, Title 29, U.S.Code] permits a general contractor's prehire agreement to require an employer not to hire other contractors performing work on that particular project site unless they agree to become bound by the terms of that labor agreement." Id. at 230, 113 S.Ct. 1190, 122 L.Ed.2d 565. In addition, Section 8(f) of the Act unequivocally permits employers in the construction industry to enter into prehire agreements. While it is true that the Act excludes the state from the definition of the term "employer," Section 2(2), NLRA, Section 152(2), Title 29, U.S.Code, the

court, nevertheless, went on to say that "the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by these sections." Id. at 231, 113 S.Ct. 1190, 122 L.Ed.2d 565.

{¶101} It would seem to be axiomatic that what federal law gives to a person or entity, the state may not take away. To remove from local officials the right to use a tool that, for the most part, guarantees that a local project will be completed by well-trained workers, within budget and on time, is short-sighted at best and devastating at worst. Not much more, I believe, needs to be said to put to rest the arguments made here by appellees and their amici supporters.

{¶102} Accordingly, I would pronounce as syllabus law in this case that "Am.H.B. No. 101, a regulation that prohibits public-sector project labor agreements in Ohio, is preempted by the National Labor Relations Act, Sections 151 et seq., Title 29, U.S.Code, and is, therefore, unlawful." I respectfully concur with the majority.

_____

Benesch, Friedlander, Coplan & Aronoff, L.L.P., N. Victor Goodman, Mark D. Tucker and Edward Kancler, for appellant Ohio State Building & Construction Trades Council.

Goldstein & O'Connor and Joyce Goldstein, for appellant Cleveland Building & Construction Trades Council.

Wuliger, Fadel & Beyer and William I. Fadel, for appellant International Union of Operating Engineers, Local 18.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Kathleen A. Martin, Assistant Prosecuting Attorney, for appellee Cuyahoga County Board of Commissioners.

Betty D. Montgomery, Attorney General, Michael D. Allen and Peter M. Thomas, Assistant Attorneys General, for appellee state of Ohio.

Stewart Jaffy & Assoc. Co., L.P.A., Stewart R. Jaffy and Marc J. Jaffy, urging reversal for amicus curiae Ohio AFL-CIO.

Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Laurence J. Cohen and Victoria L. Bor, urging reversal for amicus curiae Building & Construction Trades Dept., AFL-CIO.

Coolidge, Wall, Womsley & Lombard, Fred A. Ungerman Jr. and Jill A. May, urging affirmance for amicus curiae Ohio Associated Builders & Contractors, Inc.

Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., and Susan Carson Rodgers; National Right to Work Legal Defense Foundation, Inc. and William L. Messenger, urging affirmance for amicus curiae National Right to Work Legal Defense Foundation, Inc.

_____